UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

P.H. GLATFELTER COMPANY,

    Plaintiff,

v.

Case No. 2:11-CV-741
JUDGE EDMUND A. SARGUS, JR.
MAGISTRATE JUDGE ELIZABETH P. DEAVERS

UNITED STEEL, PAPER
AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION, et al.

    Defendants.

## OPINION & ORDER

This matter is before the Court on Plaintiff P.H. Glatfelter Company's and Defendants United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC and United Steelworkers, Local 731's cross-Motions for Summary Judgment (Docs. 14 & 15). For the reasons that follow, the Plaintiff's Motion for Summary Judgment (Doc. 14) is **GRANTED** and the Defendant's Motion for Summary Judgment (Doc. 15) is **DENIED**.

### I. BACKGROUND

Plaintiff P.H. Glatfelter Company ("Glatfelter") brings this action under the Federal Arbitration Act, 9 U.S.C. § 9, against Defendants United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC and United Steelworkers, Local 731 (collectively "the Union"), pursuant to Section

301 of the Labor Management Relations Act ("LMRA") of 1974, 29 U.S.C. §185, *et seq.* Glatfelter seeks to vacate an arbitration award issued on May 19, 2011.

Glatfelter is a Pennsylvania corporation that manufactures and sells various types of specialty paper and related products. (Docs. 14-4 to 14-15, A-23; A-28.)[1] Glatfelter operates a paper manufacturing facility in Chillicothe, Ohio. (*Id.*) The Union is the exclusive representative of a defined collective bargaining unit of employees working at Glatfelter's Chillicothe mill. (Compl. ¶ 3.) Glatfelter and the Union are parties to a collective bargaining agreement ("CBA"). (*Id.* ¶ 6; Doc. 1-1.)

One of the critical raw materials used in the production of paper is wood chips. (A-22; A-28.) At all times since it has owned the Chillicothe mill, Glatfelter has purchased wood chips from third parties, as well as produced them at a "woodyard" facility maintained by Glatfelter. (A-29.) There are approximately fifty employees who work at the woodyard that are in the bargaining unit represented by the Union. (A-33.)

The typical life expectancy of a woodyard is twenty to twenty-five years. (A-29.) By 2009, Glatfelter's woodyard had been in operation for over twenty-five years and was suffering from high maintenance costs and low productivity. (*Id.*) Glatfelter began to consider various alternatives to wood chip production. (A-31–42.) In considering alternatives, Glatfelter identified a company, Fulghum Fibres, Inc. ("Fulghum"), which had the capability to build and operate a new woodyard to supply Glatfelter with wood chips with more efficient production means. (A-32–53.)

On July 29, 2010, Glatfelter informed the Union that it was considering entering into an agreement with Fulghum to build and operate a new woodyard. (A-38–39; 242–50.) The Union

---

[1] The parties have stipulated to this Court's considerations of the arbitration record. The transcript of the arbitration hearing and exhibits are included in a Joint Appendix, filed as Docs. 14-4 to 14-15 of Glatfelter's Motion for Summary Judgment (Doc. 14). Hereinafter, citations to the Joint Appendix will be cited as "A-page number."

2

questioned the right of Glatfelter to unilaterally close the woodyard and contract with Fulghum, on the basis that Glatfelter did not have such authority under the CBA. A series of meetings was held between the parties to discuss possible alternatives, but an agreement was never reached. On August 10, 2010, Glatfelter informed the Union of its intention to proceed with Fulghum. (A-273–84.)

On August 18, 2010, the Union filed a grievance, pursuant to Article XIV of the CBA, challenging Glatfelter's right to enter into a contract with Fulghum. (A-232.) The grievance alleged the following violations of the CBA:

> 1. It constitutes a transfer of a critical plant operation to a third party in violation of the successorship language and attrition language of the preamble to the contract.
>
> 2. It violates the recognition clause of the contract which recognizes the Union as the exclusive bargaining representative of all production and maintenance of [Glatfelter] at the Chillicothe plant (Art. I, Exhibit B wage schedule, incorporated Woodyard Agreement pp. 166–179).
>
> 3. It violates Article XXV which guarantees the continuation of the Woodyard wage scales for the life of the Agreement.
>
> 4. It violates Article XXIV by amending and altering the Agreement through unilateral Company action without the consent of the Union.

(A-232.)

On August 26, 2010, Glatfelter provided the Union with a formal response, summarizing the advantages to contracting the woodyard operation with Fulghum. (A-233–35.) Glatfelter asserted that the management rights provision in the CBA granted Glatfelter the right to make the operational judgment to shut down Glatfelter's woodyard and contract with Fulghum to supply wood chips. (A-233.)

3

The parties continued to meet throughout the fall of 2010. In accordance with the CBA, the grievance was processed through the appropriate steps and ultimately submitted to arbitration. The arbitration was conducted pursuant to the rules of the Federal Mediation and Conciliation Service, as provided for in the CBA. (A-89.) The parties requested names of potential arbitrators, went through a process of striking names, and ultimately agreed to select arbitrator Terry Bethel for final and binding arbitration.

An arbitration hearing was held on March 3, 2011. On the morning of the hearing, the arbitrator informed the parties that he was from Chillicothe and had worked briefly at the paper mill for a summer during college forty-three years ago. (A-2.) Neither party objected to his service based upon this disclosure.

On May 19, 2011, the arbitrator issued his Award and Opinion, sustaining the Union's grievance and holding that Glatfelter could not contract out the operation of its woodyard. (A-372–93.) The arbitrator framed the issue to be decided as whether Glatfelter "acted in good faith and whether it exercised reasonable business judgment when it decided to close its woodyard in favor of buying chips from a contractor." (A-389.) The arbitrator found that although Glatfelter did not act in bad faith, the CBA placed some limitations on Glatfelter's right to contract out work, including that its action be a reasonable business judgment. (A-391.) The arbitrator further found that Glatfelter had not presented evidence to explain or corroborate the cost estimate for constructing a new woodyard, nor did it provide information about how much it would cost Glatfelter to buy wood chips from Fulghum. (*Id.*) Based on the absence of information in the record to explain Glatfelter's cost estimates, the arbitrator determined that he could not conclude that Glatfelter's decision "to contract out—and its attendant effect on the employees and the [CBA]"—was supported by a reasonable business justification. (A-392.)

4

After the arbitrator's Award and Opinion was issued, a bargaining unit employee informed Glatfelter that the arbitrator had first cousins in the bargaining unit represented by the Union. (Affidavit of Victoria Schafer, Human Resources Director for Glatfelter, ¶ 9.) Glatfelter maintains that it had no knowledge of this relationship prior to receipt of the Award and Opinion of this information. (*Id.* ¶ 8.) Glatfelter conducted an investigation and discovered that the arbitrator had six first cousins working in the bargaining unit at the plant, two of whom worked in the pulp mill maintenance department that serviced the woodyard. (*Id.* ¶ 10.) Glatfelter asserts that, had it been aware of this information, it would not have agreed to accept the arbitrator to hear this case. (*Id.* ¶ 11.) On the basis of this new information, Glatfelter's counsel sent the arbitrator a letter, expressing Glatfelter's view that the arbitrator's familial connection created a conflict of interest that should have been disclosed to the parties. In the letter, Glatfelter's counsel requested that the arbitrator vacate the award. (A-394–95.)

The arbitrator responded on July 5, 2011, asserting that he lacked authority under the Code of Responsibility for Arbitrators of Labor-Management Disputes to vacate the award. (A-396–98.) The arbitrator admitted that he had not disclosed the fact that he had six first cousins working at the Chillicothe mill to the parties prior to, during, or after the arbitration hearing, but rejected the claim that his familial relationship may have created a conflict of interest. (A-397.) The arbitrator explained that he has a very large extended family and has not seen most of his first cousins for at least thirty years. (*Id.*) The arbitrator admitted that he knew, prior to the hearing, that he had at least four first cousins working at the Chillicothe mill. (*Id.*) He provided that his recent contact with the cousins was limited to encounters with two of them at a funeral and family picnic. (*Id.*) The arbitrator further provided information that detailed his contact (or

lack thereof) with these cousins, and maintained that he had not intended to deceive Glatfelter. (A-397–98.) In closing, he stated:

> To be candid, I understand [Glatfelter's] concern, and I regret that I did not think about my cousins and disclose the family relationship. I'm sorry for the problem this has caused. However, having relatives in the mill was not on my mind when I heard and decided the case, and it did not influence my decision.

(A-398.)

Glatfelter filed this action on August 15, 2011, seeking to vacate the arbitration award on two grounds: (1) the evident partiality of the arbitrator; and (2) the arbitrator exceeded his authority by not basing his decision on an arguable construction of the CBA. (Doc. 1.) The Union filed an Answer and Counterclaim on October 3, 2011, seeking to enforce the arbitration award. (Doc. 5.) Both parties have moved for summary judgment. (Docs. 14 & 15.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 390 (6th Cir. 2009); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A motion for summary judgment should be denied if "there is a genuine need for trial," which turns on "whether the evidence is such that a reasonable jury could return a verdict for the [non-moving party]." *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 375 (6th Cir. 2002).

Once "a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading." *Viergutz v. Lucent Technologies, Inc.*, 375 F. App'x. 482, 485 (6th Cir. 2010). Instead, the party opposing summary

6

judgment "must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine need for trial." *Id.*; *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

Here, the parties have filed cross-motions for summary judgment. In reviewing cross-motions for summary judgment, the Court should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad.*, 929 F.2d at 248.

## III. DISCUSSION

Glatfelter contends that the arbitration award should be vacated for two reasons: (1) the evident partiality of the arbitrator; and (2) the arbitrator exceeded his authority by not basing his decision on an arguable construction of the CBA. The Union contends that: (1) the facts in this case do not establish a claim for evident partiality under the relevant standard because a reasonable person could not conclude that the arbitrator was partial to the Union; and (2) the arbitrator's award was based on a valid interpretation of the CBA. The Court will first address the claim of evident partiality.

7

The Federal Arbitration Act ("FAA") expresses a presumption that arbitration awards will be confirmed. 9 U.S.C. § 9; *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 429 F.3d 640, 643 (6th Cir. 2005). "When courts are called on to review an arbitrator's decision, the review is very narrow." *Nationwide*, 429 F.3d at 643. "As long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Id.* (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987)). Thus, "a federal court may vacate an arbitration award only in very limited circumstances." *Id.* "Those circumstances include 'where the arbitrators exceeded their powers,' 9 U.S.C. § 10(a)(4), and where the arbitrators act with 'manifest disregard for the law.'" *Id.* (quoting *Dawahare v. Spencer*, 210 F.3d 666, 669 (6th Cir. 2000)). In addition, an arbitration award may be vacated upon a showing of "evident partiality" on the part of the arbitrator. 9 U.S.C. § 10(a)(2); *id.*

To establish "evident partiality" on the part of the arbitrator, the Sixth Circuit has adopted the view that "the challenging party must show that a reasonable person would have to conclude that an arbitrator was partial to the other party to the arbitration." *Uhl v. Komatsu Forklift Co., Ltd.*, 512 F.3d 294, 306 (6th Cir. 2008) (quoting *Apperson v. Fleet Carrier Corp.*, 879 F.2d 1344, 1358 (6th Cir. 1989)). In order to sustain that burden, "the party asserting evident partiality must establish specific facts that indicate improper motives on the part of the arbitrator." *Uhl*, 512 F.3d at 306 (quoting *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 329 (6th Cir. 1998)). It is not enough to demonstrate "an amorphous institutional predisposition toward the other side." *Id.*

Thus, the question is whether Glatfelter has sustained its burden to establish "specific facts that indicate improper motives on the part of the arbitrator." *Id.* The Court concludes that

8

it has. Glatfelter has established that the arbitrator has six first cousins working at the Chillicothe mill who are bargaining unit employees. Glatfelter has also established that two of these cousins work in the pulp mill maintenance department that serviced the woodyard, and thus had a direct stake in the outcome of the dispute. Glatfelter has further established that the arbitrator knew of these relationships before the hearing and did not disclose this information to the parties prior to, during, or after the arbitration hearing, and that had Glatfelter been aware of this information, it would not have agreed to accept the arbitrator to hear this case.

In its briefing, the Union claims, quite correctly, that no case has addressed the exact factual scenario and that there is a lack of authority for a finding of "evident partiality" in such a relationship among cousins. The Court believes, however, the simple reason for this lack of precedent is that arbitrators in similar situations have disqualified themselves rather than risk a charge of partiality. *See Transportes Coal Sea de Venezuela C.A. v. SMT Shipmanagement & Transport Ltd.*, No. 05-CV-9029, 2007 Wl 62715, at *8 (S.D.N.Y. Jan. 9, 2007) ("There is little case law that discusses whether and to what extent a familial relationship between an arbitrator and a party merits vacating an arbitration award. . . . familial relationships are frequently particularly close and often evoke inherent prejudices stronger than those that result from long experience in a particular industry.").

The Court makes clear, however, that it is not of the view that such a relationship—that is, one among first cousins—always gives rise to a finding of "evident partiality." Rather, the specific, undisputed facts in this case indicate that: (1) the arbitrator had not one—but six—first cousins working at the Chillicothe mill; (2) the arbitrator knew of these relationships before the arbitration hearing; and (3) the arbitrator did not disclose these relationships to the parties prior to, during, or after the arbitration hearing. The record also indicates that there is no internal

9

mechanism in place to remedy the situation. The Court does not know how close the arbitrator and the six first cousins are, how independent they are of one another, or how divergent their views are on the issues giving rise to the arbitrated dispute. Notwithstanding the lack of specific information, the Court holds that the existence of the uncontested relationships at issue should have been disclosed and is such that a reasonable person would have to conclude that the arbitrator was partial. Accordingly, the Court vacates the arbitration award issued in this case on May 19, 2011.

Having concluded that Glatfelter has made a showing of "evident partiality" on the part of the arbitrator to warrant vacation of the arbitration award, the Court need not address the parties' argument as to whether the arbitrator based his decision on an arguable construction of the CBA.

With regard to the parties' request for an award of reasonable attorneys' fees and costs in connection with this action, the Court notes that § 301 of the LMRA does not authorize an award of attorney's fees as an element of damages. *Knollwood Cemetary Ass'n v. United Steelworkers of Am.*, 789 F.2d 367, 269 (6th Cir. 1986). "Under the American Rule it is well established that attorney's fees are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor." *Summit Valley Indus. v. United Bhd. Of Carpenters & Joiners*, 456 U.S. 717, 721 (1982). While *Summit Valley* left open the possibility of a court using its equitable powers to make exceptions to the American Rule to award fees "where necessary to further the interests of justice," the Court finds exercising those powers would be inappropriate in this case, particularly since neither party has made a substantial attempt to justify its claim for fees.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff P.H. Glatfelter Company's Motion for Summary Judgment (Doc. 14) is **GRANTED**. Defendants United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied-Industrial and Service Workers International Union, AFL-CIO/CLC and United Steelworkers, Local 731's Motion for Summary Judgment (Doc. 15) is **DENIED**.

The arbitration award issued on May 19, 2011 is **VACATED**. The parties shall submit to arbitration, conducted pursuant to the rules of the Federal Mediation and Conciliation Service, in accordance with the CBA. The new arbitrator is free to give as much or as little deference to the previous arbitrator's decision as he or she so chooses.

The Clerk is directed to close this matter and enter judgment in favor of the Plaintiff.

**IT IS SO ORDERED.**

8-21-2012
**DATED**

EDMUND A. SARGUS, JR.
UNITED STATES DISTRICT JUDGE